IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: ETHICON, INC., POWER MORCELLATOR | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | MDL No. 2652 |
| | ) | |
| **(This Document Relates to All Cases)** | ) | D. Kan. No. 15-md-2652-KHV |

**OBJECTION TO PLAINTIFFSTEERING COMMITTEE'S MOTION ESTABLISHING AN ETHICON COMMON BENEFIT FUND BY ATTORNEY FRANÇOIS M. BLAUDEAU AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW Attorney François M. Blaudeau, pursuant to the Court's instruction, and files this Objection to Plaintiff Steering Committee's (PSC) Motion Establishing an Ethicon Common Benefit Fund. In support of this objection, Attorney Blaudeau respectfully shows the Court the following:

**STATEMENT OF PERTINENT FACTS**

The Southern Institute for Medical & Legal Affairs and the Heninger Garrison Davis Law Firm (collectively, "Firm") filed the very first case in the United States involving a claim for dissemination of a leiomyosarcoma against a morcellator manufacturer on March 14, 2014, and has been working on behalf of its clients in an effort to hold morcellator manufacturers responsible for injuries related to disseminated leiomyosarcoma. Although the Firm did not feel that a MDL was warranted in this matter for specific reasons including the fact that there were not that many cases nationally and that individual cases where women were in the process of dying needed to move through the Courts as quickly as possible, the Firm felt that it had no choice but to participate in the MDL process once a MDL motion was filed by Paul Pennock. The reality is quite simple. Mr. Pennock and his firm, along with a number of other law firms across the country who often work together on MDL litigations, basically formed a group to file for an MDL. This group of lawyers and law firms saw an opportunity to inject themselves into

the morcellator litigation even though a large number of these lawyers and law firms did not have any morcellator litigation cases filed. Of those few cases that they had filed, more than one was a "me too" version of the complaints prepared and filed by the Firm in its cases. At that time, the Firm, along with the Tracey Fox law firm, had the largest inventory of cases in the country and had been litigating cases across the country. Both the Firm and the Tracey Fox law firm were not in favor of a MDL, but were compelled to participate in the process to ensure proper representation of their clients.

The process of MDL formation through the JPLM panel has improved efficiency in the federal courts and has streamlined <u>Daubert</u> issues and has allowed the resolution of a large of number of cases. Through this process, the juggernaut of common benefit fees has become a cottage industry in and of itself. Paul Pennock sought to obtain MDL status for the morcellator cases and to obtain lead status for himself. The powers given to a lead counsel in an MDL litigation are extraordinary in the ability to direct and manage litigation including the process of asking the MDL Judge for common benefit funds. There has been an increasing amount of concern nationally over the fact that the MDL process has been essentially controlled by a limited amount of law firms that work among themselves to maintain control of the majority of MDL litigations -- to their collective financial benefit.

This case illustrates these issues as well as any case that has come before it. The question to be decided is what benefit has the MDL and the PCS given to the subset of plaintiffs represented by the Firm? To answer it, the Court necessarily must consider which attorneys – the PSC or the Firm -- actually have been heavily involved in the litigation and which of them have produced beneficial results *for clients* (versus wished-for benefits for lawyers).

What Mr. Pennock and the members of the PSC would like this Honorable Court to do is lend them a hand in extracting money from this subset of plaintiffs. Those plaintiffs and the Firm were in the process of settlement negotiations prior to the JPLM hearing which led to the order creating the MDL. The Firm felt that it had a duty to its clients to participate in some way with the MDL process once it was started by Mr. Pennock and the consortium of firms, many of whom did not even have a filed case in this litigation. Francois Blaudeau formally applied for and was approved by this Honorable Court to serve on the PSC. However, with the settlement of the cases against Ethicon and with the fact that there is such a large number of lawyers already on the PSC, there is no reason for a request for resignation not to be granted. In fact, reducing the cost of two additional lawyers and law firms on the PSC would lower the cost of the Common Benefit Fund to the remaining plaintiffs and their attorneys, an objective and a result which should be considered as fiduciary responsibilities, particularly since a majority of the cases transferred to this Court by the JPML have been settled.

## STANDARD OF REVIEW

"In awarding attorneys' fees, the district judge is empowered to exercise his informed discretion, and any successful challenge to his determination must show that the judge abused that discretion." *Lindy*, 487 F.2d 161 (3rd. Cir. 1973) (citing *Tranberg v. Tranberg*, 456 F.2d 173, 175 (3d Cir. 1972)).

## COMMON BENEFIT DOCTRINE, GENERALLY

The award of attorney's fees to plaintiffs in class actions and derivative suits is based upon the common benefit doctrine, an exception to the American Rule that prevailing litigants must pay their own attorneys' fees. *Rosenbaum v. McAllister*, 64 F.3d 1439 (10th Cir. 1995) (citing *Hall v. Cole,* 412 U.S. 1, 5, 93 S. Ct. 1943 (1973)). The doctrine applies where "the

plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. 412 U.S. at 5, 93 S. Ct. at 1946 (quoting *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 393–94, 90 S. Ct. 616, 626 (1970)). The common benefit doctrine originates from the common fund exception, under which "the successful plaintiff is awarded attorney fees because his suit creates 'a common fund, the economic benefit of which is shared by all members of the class.'" *Aguinaga,* 993 F.2d at 1482 (quoting *Hall,* 412 U.S. at 5 n. 7, 93 S.Ct. at 1946 n. 7).

"The common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.) (quoting *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749 (1980)), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66 (1988). When the common benefit is a fund, fees are "extracted from the predetermined damage recovery rather than obtained from the losing party." *Id.*

**A Claim Under the Common Benefit Doctrine is Analogous to an Action for Quantum Meruit, not Unjust Enrichment.**

Relying on *Greenough* and its progeny, the Third Circuit in *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, explained the rationale of common or equitable-fund fee awards as follows:

> *The award of fees under the equitable fund doctrine is analogous to an action in quantum meruit:* the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed. Understood in this way, there are two possible "causes of action" that may be urged as the basis for award of attorneys' fees. One of these "causes" belongs to the plaintiff who brought the underlying suit. His claim is that by instituting the suit he has performed a service benefiting

> other class members. *The reasonable value of that service is measured by the expenses incurred by the plaintiff on behalf of the class.* The second "cause of action" for award of attorneys' fee under the equitable fund doctrine belongs to the attorney. The attorney's claim is that his conduct of the suit conferred a benefit on all the class members, that one or more class members has agreed by contract to pay for the benefit the attorney conferred upon him, *and that the remaining class members should pay what the court determines to be the reasonable value of the services benefiting them…*

ALBA CONTE, ESQ., JD, ATTORNEY FEE AWARDS § 2:1 (3d ed.) (citing *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973)).

But some commentators have regarded the common or equitable-fund doctrine as being derived from principles of unjust enrichment, which is traditionally remedied by restitution relief. These commentators were troubled that this doctrine could be applied to award a percentage of the fund for a fee award, instead of being limited to reimbursement on a time-based formula which was more traditional under restitution concepts. ATTORNEY FEE AWARDS § 2:1*;* Dawson*, Lawyers and Involuntary Clients: Attorney Fees From Funds*, 87 HARV. L. REV. 1597 (1974); *accord* Berger*, Court Awarded Fees: What Is 'Reasonable'?*, 126 UNIV. PA. L. REV. 281 (1977) (citing Dawson).

Professor Berger explains why the unjust enrichment theory is not a sound legal basis to support percentage awards:

> The enrichment is unjust, however, only to the extent that the beneficiaries have not compensated the creator for the losses he or she incurred. Beyond that, the enrichment—even though it may have been unanticipated by the beneficiaries—is not unjust at all, but merely a measure of their legal injury. By awarding attorneys a share of the damages which exceeds the value of their time and effort expended, the courts have applied the extraordinary equitable remedy of fee awards in a way that exceeds its rationale.

Berger, *Court Awarded Fees: What Is 'Reasonable'?*, 126 UNIV. PA. L. REV. 281 at 299.

Therefore, when analyzing whether or not the common benefit doctrine is applicable, one should base his conclusions on the distinguished concepts of quantum meruit and not unjust enrichment.

**The Common Benefit Doctrine Does Not Apply to the Firm Because There Were No Services Performed by the PSC that Conferred any Substantial Benefit upon the Firm or its Clients.**

The Firm does not dispute that creating a common benefit fund is warranted when plaintiffs' attorneys expend significant amounts of time, effort, and money drafting pleadings, reviewing documents, and taking or defending depositions. *See, e.g., Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 909 (8th Cir. 2014). A common benefit fund also can be warranted after attorneys expend significant efforts on the administration of an MDL, serving as a repository of information concerning the litigation, or obtaining favorable discovery and evidentiary rulings that apply on a litigation-wide basis. *See, e.g. In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 162110 at *2–3 (S.D. Ill. Nov. 13, 2012).

The PSC has the burden to prove that it is entitled to a common benefit assessment. *See Gaffney v. Riverboat Servs.*, 451 F.3d 424, 467 (7th Cir. 2006). For the PSC to be entitled to have a common benefit fund created – specifically, a fund with an ambit large enough to encompass even the earliest settled cases of this litigation – they must demonstrate that the Firm belongs to the ascertainable class or group of plaintiffs, and that their services were "the catalyst or proximate cause for the benefits" bestowed on that group of plaintiffs. *See Mulligan Law Firm v. Zyprexa MDL Plaintiff s' Steering Comm. II (In re Zyprexa Prods. Liab. Litig.)*, 594 F.3d 113, 128-130 (2d Cir. N.Y. 2010); *In re Estate of Maniaci-Canni*, 2013 U.S. Dist. LEXIS 129758, *12 (E.D.N.Y. Sept. 10, 2013). In other words, a common benefit fund is only appropriate when

the plaintiffs "receive […] a substantial benefit from the leadership group's work." In re *Genetically Modified Rice Litig.*, 2010 U.S. Dist. LEXIS 19168 (E.D. Mo. Feb. 24, 2010).

The Southern Institute for Medical and Legal Affairs and the Heninger Garrison Davis law firm began work on this litigation as early as October 2013. The Firm filed the first case in the country on March 14, 2014. Thereafter, the Firm pursued an aggressive litigation strategy to fight off multiple dispositive motions from Defendants, which then allowed the Firm to proceed with the litigation process – including, but not limited to taking depositions, conducting discovery, and participating in mediation and settlement negotiations.

Mr. Pennock and Attorney Blaudeau exchanged emails in January, where the creation of an MDL was first mentioned, and where Attorney Blaudeau voiced his intention to not join or participate in the creation of a MDL. He had filed the first cases in the country and had worked diligently to further the litigation, so he was not disposed to follow a firm comparatively new to the key issues involved and which had not yet progressed on the steep learning curve of the litigation. Mr. Pennock at that time offered some ideas for coordinated <u>Daubert</u> preparation, but that was never actually performed by him or his group, and the MDL motion was not filed until June 2015, which was done without notice to Attorney Blaudeau. In response, the Firm worked successfully to rein in the MDL proposed in that motion, arguing to the JPML that any MDL ordered should be more narrow than Mr. Pennock's proposal. MDL No. 2652, Dkt. 39. The JPML agreed with the Firm. Its order on the motion reflects that.

The PSC's argument that the Common Benefit Fund should apply to the Firm is entirely based upon conjecture. First, the PSC claims that the settlement negotiations between the Firm and defendants may have stalled sometime prior to the JPML determination that created the MDL. PSC Motion to Est. CBF at ¶11. This claim is incorrect. The Firm had made the

resolution of these cases an ongoing project as early as March 2015, and the Firm had been actively engaged in settlement negotiations with Defendant well before the PSC even had an opportunity to perform any work in this MDL. Those negotiations continued despite interruption from the creation of the MDL and formation of the PSC. Further, the Firm had a mediation with Ethicon in August 2015. Even if, as the PSC suggests, there was an apparent pause in communication with Defendants regarding settlement, the explanation lies in undersigned counsel's ethically required response to the creation of the MDL. At the time of MDL creation, the undersigned had a multitude of cases subject to transfer and consolidation and felt he owed an ethical duty to his clients to see that the work in this litigation continued to be performed at the standard promised to the clients. Therefore, the undersigned applied for membership on the PSC in order to adequately protect his clients' interests. Any pause entailed that activity and only that activity, and only for that reason.

Now, the Firm has performed work on these cases for over twenty-seven (27) months. Further, it has settled most of its cases and a smaller number remain. The PSC has filed a Motion to Establish an Ethicon Common Benefit Fund and seeks to have that fund applied to the Firm's cases that were settled due to services it performed – namely: depositions, discovery, negotiations, federal court motion practice, and mediations – all of which were actually performed by the Firm, not the PSC.

Second, the PSC argues that the court should apply the common benefit fund to the Firm's cases on the mere basis of an apparent connection between the creation of the MDL, formation of the PSC, and settlement of the Firm's cases. *See* PSC Mot. To Est. CBF at ¶11. Again, it is important to note the timeline here – the Firm had been in active settlement negotiations on morcellator litigation as early as March 2015, it had filed the first case in the

country on March 14, 2014, and it has been involved in preparing the litigation since October 2013. Therefore, this apparent causal connection between the creation of the MDL and formation of the PSC and settlement of the Firm's cases is implausible and without merit because the Firm has been *substantially and meaningfully* involved in the development of this litigation (and the resolution thereof) long before Mr. Pennock and the MDL.

Even if this Court were to find that there is an apparent nexus between the creation of the MDL, formation of the PSC, and settlement of the Firm's cases, the PSC's argument, however, must fail because the reasonable value of any service conferred by the PSC upon the Firm is measured by the expenses incurred on behalf of the class. *See* ATTORNEY FEE AWARDS § 2:1, *supra*. Because the PSC has rooted its claim in the apparent nexus discussed, *supra*, it must fail *ipso facto* because the PSC may only be reimbursed when it performs services in furtherance of the litigation and confers a substantial benefit upon an ascertainable class of plaintiffs. The PSC is not entitled to compensation from the undersigned or his clients for merely creating itself or any collateral settlements which occurred concurrently with its formation.

**The Firm and its Clients are not Members of the Ascertainable Class Substantially Benefited by the Services of the PSC.**

The Firm's clients are not members of the ascertainable class benefited by the MDL or PSC because it filed the first cases in the country and performed the entirety of the legal services that lead to settlement. Therefore, the Firm is not similarly situated with the class of plaintiffs whom the PSC has actually conferred a substantial benefited upon. *See Skelton v. General Motors Corp.*, 860 F.2d 250, at 252 (7th Cir. 1988) (holding that the common fund doctrine is based on the equitable notion that those who have benefited from litigation should share its costs).

In other words, "the doctrine operates when a plaintiff in an individual or representative capacity creates, increases, or preserves a fund whose monetary benefits extend to an ascertainable class of persons similarly situated." ATTORNEY FEE AWARDS § 2:1 (3d ed.).

**The PSC is Attempting to Use Control of the MDL to Apply a Broad Common Benefit Fund to Increase their Compensation, and the PSC has Failed its Burden to Establish the Enormous Scope of its Proposed Fund.**

This excerpt from the *Vanderbilt Law Review* explains the ubiquitous questionable conduct of lead attorneys (fiduciaries), such as members of this PSC, in MDLs.

> As explained, lead attorneys are fiduciaries who must put the interests of claimants and non-lead lawyers ahead of their own. Recently, however, lead attorneys have used their control of settlement negotiations to increase their compensation. They have built favorable fee and cost-reimbursement provisions into global settlements and have required claimants and non-lead attorneys to waive any objections they may have to these provisions as a condition for participating. Judges know about this behavior but have not condemned it. Some have even approved these self-enriching acts.

Charles Silver & Geoffrey P. Miller, *The Quai-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107, 131 (2010).

In a subsequent law review article titled *Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, Professor Silver explained how the legal basis for these coercive transfers, precisely what we deal with here, is largely unclear.

> Consider practices relating to common benefit fees and expenses. Very little authority addresses these practices, and almost none of it comes from appellate courts. Although MDL judges force disabled lawyers to cover lead lawyers' fees and expenses, the legal basis for these coercive transfers is unclear. The MDL statute says nothing about compensation. Federal judges' inherent power to manage their dockets, which empowers them to fine lawyers who act improperly, provides no basis for orders that force innocent lawyers to give up millions of dollars. The strongest

> justification is provided by the restitutionary theory that supports
> fee awards in class actions, but that theory does not work in MDLs,
> for reasons Professor Miller and I explained.

Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, 79 FORDHAM L. REV 1985 (2011).

Here, the PSC argues that the scope of the proposed common benefit fund is reasonable becauseits assessment is (1) flexible, and(2) depends on the date of settlement and solely the work its members performed to form the PSC. The PSC says that work was so substantial and significant as to warrant the application (to the fund) of a resigning PSC member's cases, notwithstanding the resigning PSC member's basis for resignation – the widespread resolution of his cases some time ago. *See* PSC's Mot. To Estab. Ethicon CBF at ¶13-14. But the PSC fails to meet its burden because it has not shown this Honorable Court any evidence that any benefit the PSC's inception had on the Firm's settlements is proportional to the amount sought in its motion *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393–94 (1970). Further, while the firm has been involved here since October 2013, the PSC has fundamentally ignored the services performed by the Firm in the interest of its clients.

## CONCLUSION

The PSC has no factual or legal basis on which to seek compensation through the establishment of a common benefit fund retroactively applicable to the Firm's cases. The PSC seeks payment on the basis of its reputation, evidently, and only on that basis. Certainly it has no actual work to weigh in favor of payment. The work leading to the settlements was performed by the Firm. The Firm has demonstrated that the PSC's conduct here is irresponsible and questionable, and that granting the PSC's proposed fund would be unduly prejudicial to the Firm, its counsel, and its clients. Such an award or windfall would also encourage lawyers to file early MDL petitions and seek to control national litigation, cornering the leadership and unlimited

power and benefit which arise from creating and controlling Common Benefit Fund legal work at the expense of other lawyers. We should use this example to demonstrate how a PSC can sometimes overreach in its application of a Common Benefit Fund. Some of the other issues raised by Mr. Pennock regarding me personally will be responded to by *en camera* letter and documentation to this Honorable Court.

WHEREFORE, we ask this Honorable Court to deny the Motion for a Common Benefit Fund to the extent that it is retroactively applied to the Firm's settlements in this matter; and that this Honorable Court grant the resignation of François Blaudeau and Heninger Garrison Davis from the PSC; and that this Honorable Court deny the request of the PSC in regard to the request that the Firm participate in the $50,000.00 advance to the PSC, as neither the Firm or its clients have or will benefit from the ongoing work of the PSC in any way.

Respectfully submitted,

/s/ François M. Blaudeau
François M. Blaudeau
Southern Institute for Medical & Legal Affairs
Of counsel, Heninger Garrison Davis
2224 1st Avenue North
Birmingham, Alabama 35203
Phone: (205) 547-5525
Fax: (205) 547-5526
Francois@southernmedlaw.com

## PROOF OF SERVICE

I hereby certify that on this 21st day of January, 2015, a true and correct copy of the foregoing Motion was filed electronically via this Panel's CM/ECF filing system and was served on all parties and counsel of record by operation of the CM/ECF system.

/s/ François M. Blaudeau
François M. Blaudeau
Southern Institute for Medical & Legal Affairs
*Of counsel*, Heninger Garrison Davis
2224 1st Avenue North
Birmingham, Alabama 35203
francois@southernmedlaw.com
